1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11    XENIA SIMMONS, et al.,                    No. 2:21-cv-02215-TLN-DMC

12               Plaintiffs,

13         v.                                   **ORDER**

14    LIBERTY MUTUAL FIRE INSURANCE
      COMPANY,
15
                 Defendant.
16

17

18         This matter is before the Court on Defendant Liberty Mutual Fire Insurance Company's

19   ("Defendant") Motion for Summary Judgment.  (ECF No. 19.)  Plaintiffs Xenia Simmons

20   ("Simmons"), Arthur Rotter, Gene Rotter, Danielle Rotter, and Kellyanne Rotter (collectively,

21   "Plaintiffs") filed an opposition.  (ECF No. 25.)  Defendant filed a reply.  (ECF No. 31.)  For the

22   reasons set forth below, the Court DENIES Defendant's motion.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

                                        1

1    **I.      FACTUAL AND PROCEDURAL BACKGROUND**[1]

2         On June 20, 2018, Simmons was traveling northbound on East Street in Redding,

3    California when a vehicle driven by Jordan Verdugo ("Verdugo") made a sudden left turn in front

4    of her in the intersection and crashed into Simmons's vehicle.  (ECF No. 31-2 at 2.)  As a result

5    of the accident, Simmons sustained significant injuries, including a punctured left lung, fractured

6    ribs, and a low back injury.  (*Id.*)  At the time of the accident, Simmons was insured with

7    Defendant under LibertyGuard Auto Policy No. A02-268-817042-40 7 (the "Policy"), which had

8    a $250,000 per person limit of liability for uninsured motorist ("UIM") coverage.[2]  (*Id.*)

9         On June 29, 2018, Simmons's insurance broker reported the accident to Defendant.  (*Id.*)

10   Defendant opened a bodily injury claim for Simmons and began monitoring her claim against

11   Verdugo.  (*Id.* at 3.)  On July 20, 2018, Simmons notified Defendant she had retained counsel to

12   represent her in connection with her claim against Verdugo.  (*Id.*)  Over the next ten months,

13   Defendant made numerous attempts to contact Simmons and/or her counsel.  (*Id.*)  On August 12,

14   2019, Simmons phoned into Defendant's call center to report that her counsel located a witness

15   who confirmed Verdugo ran a red light and that Simmons was not at fault for the accident.  (*Id.*)

16        Defendant followed up with Simmons's counsel to request a copy of Simmons's personal

17   statement and the witness information on August 13, 2019, and again on September 3, 2019.  (*Id.*)

18   Simmons's counsel provided Defendant the requested information on September 9, 2019.  (*Id.* at

19   4.)  That same day, Simmons's counsel sent Defendant a letter indicating that Simmons settled

20   her claim with Verdugo's insurance company for $100,000.  (*Id.*)  The letter demanded Defendant

21   pay the $150,000 in remaining UIM limits under the Policy.  (*Id.*)  The demand letter alleged

22   Simmons incurred $657,197 in damages because of the accident, itemized as follows: $104,197 in

23   _____

24   [1]      The following facts are undisputed unless otherwise noted.  The Court will not address
     objections to evidence upon which it did not rely.

25   [2]      In California, "[w]hen bodily injury is caused by one or more motor vehicles, whether
26   insured, underinsured, or uninsured, the maximum liability of the insurer providing the
     underinsured motorist coverage shall not exceed the insured's underinsured motorist coverage
27   limits, less the amount paid to the insured by or for any person or organization that may be held
     legally liable for the injury."  Cal. Ins. Code § 11580.2(p)(4).

28

1    past medical expenses; $50,000 in future medical expenses; $250,000 in past general damages;

2    and $250,000 in future general damages.  (*Id.*)  The demand letter included medical bills totaling

3    $104,197, including $91,289 for a hospital stay.  (*Id.*)

4         The demand letter also included reports from various doctors Simmons saw after the

5    accident, including reports from her pulmonologist, Dr. Rafael Lupercio.  (*Id.* at 18.)  Dr.

6    Lupercio assessed Simmons as having the following active problems: (1) Bronchiectasis with

7    Acute Exacerbation; (2) Chronic Interstitial Lung Disease; (3) cough; and (4) shortness of breath.

8    (*Id.*)  In one of Dr. Lupercio's reports dated January 20, 2019, he stated Simmons had a 30%

9    decline in lung capacity and paralysis of her left hemidiaphragm "most likely related to the

10   accident."[3]  (*Id.*)  Defendant's claim notes dated September 23, 2019, acknowledge Defendant

11   was aware of the issues raised in the demand letter and attachments.  (*Id.* at 19.)

12        On September 24, 2019, Defendant contacted Simmons's counsel and requested

13   additional information regarding Simmons's medical expenses.  (*Id.* at 5.)  It is unclear whether

14   Simmons provided further information or otherwise responded to Defendant's request.  On

15   October 1, 2019, Defendant sent a letter rejecting Simmons's demand to pay the UIM policy

16   limits.  (*Id.*)  More specifically, Defendant notified Simmons's counsel that Defendant's

17   calculation of Simmons's medical expenses was $24,203.  (*Id.*)  Because Simmons had already

18   received $100,000 from Verdugo's carrier, and thus, more than $75,000 in general damages,

19   Defendant further notified Simmons's counsel that Defendant determined Verdugo was not

20   underinsured within the meaning of the Policy.  (*Id.*)  In the same letter, Defendant invited

21   counsel to provide Defendant with a Medicare ledger and/or any new information regarding

22   Simmons's medical expenses, or the valuation of her claim, that Simmons wanted Defendant to

23   consider.  (*Id.*)  Defendant did not consult a medical practitioner before rejecting Simmons's

24   claim.  (*Id.* at 20, 22.)

25   _____

26   [3]     Defendant disputes these facts about Dr. Lupercio's reports as an "incomplete and
     inaccurate mischaracterization of the underlying documentation, which speaks for itself."  (ECF

27   No. 31-2 at 18.)  The Court has reviewed Dr. Lupercio's reports and concludes Plaintiffs'
     representation accurately reflects Dr. Lupercio's assessment.  (*See* ECF No. 25-3 at 100–115.)

28

1    On or around November 1, 2019, Simmons demanded arbitration of her UIM claim.  (*Id.*

2    at 6.)  Defendant deposed Simmons on April 27, 2020.  (*Id.*)  In her deposition, Simmons testified

3    she continued to experience trouble breathing following the accident and was unable to resume

4    activities such as gardening and attending church.  (*Id.*)

5    On May 20, 2020, Defendant retained Dr. Eric Gershwin, a rheumatologist and

6    immunologist, to perform an independent medical examination of Simmons.[4]  (ECF No. 31-2 at

7    6–7.)  On or around June 18, 2020, Simmons's counsel notified Defendant that Simmons died on

8    June 16, 2020, from acute right lung pneumonia.[5]  (*Id.*)

9    Dr. Gershwin did not examine Simmons before her death and instead issued a written

10   report on April 17, 2021, detailing his opinions regarding her cause of death.  (*Id.* at 8.)  Dr.

11   Gershwin opined that based on his review of Simmons's medical records, Simmons's left lung

12   injuries resolved after the accident and were unrelated to the right middle lobe pneumonia that

13   caused her death.  (*Id.* at 8–9.)  With respect to the cause of the pneumonia that led to Simmons's

14   death, Dr. Gershwin opined,

> Simmons had a number of underlying health issues that are noted in
> the medical excerpts; arthritis itself is a major risk factor.  But, more
> importantly, she had evidence of abdominal problems . . . Her earlier
> episode of septicemia was likely secondary to translocation of
> bacteria from her gut.  In this case, the right-sided pneumonia also
> likely originated either from her gut and her abdominal issues, but
> there is also the possibility that it originated and spread from her
> dental procedure.

20   (*Id.*)

_____

21   [4]     Plaintiffs dispute this fact, arguing "the claim notes proffered by Defendant states that on

22   May 20, 2020, Defendant engaged Dr. Gershwin to perform a record review only."  (ECF No. 31-2 at 7.)  The Court has reviewed the claim notes, which indicate Defendant "request[ed]

23   arrangements for IMR" with Dr. Gershwin and that Defendant needed "to confirm where to send films and records."  (ECF No. 19-5 at 36.)  There is no indication that "IMR" would include a

24   physical examination of Simmons.

25   [5]     Plaintiffs dispute this fact, arguing "Defendant's counsel was informed that the cause of

26   Simmons's death was due to empyema, bacterial pneumonia, and acute respiratory failure." (ECF No. 31-2 at 7.)  The Court has reviewed the letter at issue.  (ECF No. 20-5 at 2.)  Plaintiffs

27   are correct that the letter states Simmons's cause of death was "empyema, bacterial pneumonia, and acute respiratory failure."  (*Id.*)  It is unclear whether this distinction is material.

28

4

1    In April 2021, Defendant retained a second expert, Dr. Arthur Dublin.  (*Id.* at 10.)  Dr.

2    Dublin, a radiologist, reviewed the imaging of Simmons's lungs both after the accident and

3    following the pneumonia diagnosis that led to her death.[6]  (*Id.*)

4    On May 11, 2021, Simmons's counsel issued another settlement demand for the $150,000

5    in remaining UIM policy limits.  (*Id.* at 11.)  In response, Defendant offered to pay Plaintiffs

6    $27,355.10 in UIM coverage to resolve the claim based on a valuation of $100,000 in general

7    damages and $27,335.10 in special damages.  (*Id.*)  Plaintiffs declined Defendant's settlement

8    offer, and the parties proceeded to arbitration on May 18, 2021.  (*Id.*)

9    On June 1, 2021, the arbitrator issued an award in favor of Plaintiffs for $852,000, which

10   was broken down as $100,000 per year for the statistical life expectancy of Simmons, or 8.52

11   years.  (*Id.*)  In short, the arbitrator adopted Plaintiffs' expert's conclusion that Simmons

12   sustained a streptococcus infection following the accident that laid dormant for more than two

13   years before becoming active and resulting in the pneumonia that caused her death.  (*Id.* at 12–

14   13.)  On July 12, 2021, following the arbitrator's award, Defendant paid Plaintiffs the remaining

15   policy limits of $150,000, plus $41,937.80 for arbitration costs, for a total payment of

16   $191,937.80.  (*Id.* at 13.)

17   Plaintiffs filed the instant action in Shasta County Superior Court on September 20, 2021,

18   alleging claims for: (1) breach of contract; (2) insurance bad faith; and (3) elder abuse.  (ECF No.

19   1 at 12–20.)  On December 1, 2021, Defendant removed the action to this Court based on

20   diversity jurisdiction.  (*Id.* at 1.)  Defendant filed the instant motion for summary judgment on

21   December 1, 2022.  (ECF No. 19.)

22   ///

23

24   [6]    Defendant asserts "[f]ollowing his review of Simmons's medical records, Dr. Dublin
25   concluded the acute lung abnormalities relating to the accident were entirely isolated to the left
     side and had resolved years before her passing."  (ECF No. 31-2 at 10.)  Plaintiffs dispute this
26   fact, arguing Dr. Dublin's report does not state what Defendant contends it does.  (ECF No. 31-2
     at 10.)  In response, Defendant states it inadvertently referred to the incorrect exhibit, but argues
27   that the fact is supported by the claim notes for Simmons's UIM claim.  (*Id.*)  The Court has
     reviewed Dr. Dublin's report.  (ECF No. 21-2 at 2–3.)  The Court finds there are triable issues as
28   to whether Dr. Dublin's report supports the conclusion reached by Defendant.

5

1   **II.    STANDARD OF LAW**

2   Summary judgment is appropriate when the moving party demonstrates no genuine issue

3   of any material fact exists and the moving party is entitled to judgment as a matter of law.  Fed.

4   R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under summary

5   judgment practice, the moving party always bears the initial responsibility of informing the

6   district court of the basis of its motion, and identifying those portions of "the pleadings,

7   depositions, answers to interrogatories, and admissions on file together with affidavits, if any,"

8   which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v.*

9   *Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof

10  at trial on a dispositive issue, a summary judgment motion may properly be made in reliance

11  solely on the pleadings, depositions, answers to interrogatories, and admissions on file."  *Id.* at

12  324 (internal quotation marks omitted).  Indeed, summary judgment should be entered against a

13  party who does not make a showing sufficient to establish the existence of an element essential to

14  that party's case, and on which that party will bear the burden of proof at trial.

15  If the moving party meets its initial responsibility, the burden then shifts to the opposing

16  party to establish that a genuine issue as to any material fact does exist.  *Matsushita Elec. Indus.*

17  *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv.*

18  *Co.*, 391 U.S. 253, 288–89 (1968).  In attempting to establish the existence of this factual dispute,

19  the opposing party may not rely upon the denials of its pleadings, but is required to tender

20  evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

21  support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing party must

22  demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the

23  suit under the governing law, *Anderson v. Defendant Lobby, Inc.*, 477 U.S. 242, 248 (1986), and

24  that the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict

25  for the nonmoving party.  *Id.* at 251–52.

26  In the endeavor to establish the existence of a factual dispute, the opposing party need not

27  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

28  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

6

1  trial." *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89.  Thus, the "purpose of summary judgment is

2  to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

3  trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's

4  note on 1963 amendments).

5      In resolving the motion, the court examines the pleadings, depositions, answers to

6  interrogatories, and admissions on file, together with any applicable affidavits.  Fed. R. Civ. P.

7  56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982).  The opposing party's

8  evidence is to be believed and all reasonable inferences that may be drawn from the facts pleaded

9  before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S. at 255.

10  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

11  produce a factual predicate from which the inference may be drawn.  *Richards v. Nielsen Freight*

12  *Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).  Finally,

13  to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more

14  than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*

15  *Elec. Indus. Co.*, 475 U.S. at 586.  "Where the record taken as a whole could not lead a rational

16  trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. at 587.

17      **III.   ANALYSIS**

18      Defendant moves for summary judgment as to all of Plaintiffs' claims, including

19  Plaintiffs' claim for punitive damages.  (ECF No. 19.)  The Court will address each claim in turn.

20      A.   Insurance Bad Faith Claim

21      Defendant moves for summary judgment on Plaintiffs' insurance bad faith claim for two

22  reasons: (1) the claim is barred by the genuine dispute doctrine; and (2) Plaintiffs Arthur Rotter,

23  Gene Rotter, and Danielle Rotter lack standing to pursue the claim because they are not in privity

24  of contract with Defendant.  (ECF No. 19 at 18–24.)  The Court will first address the genuine

25  dispute doctrine and then the issue of standing.

26  ///

27  ///

28  ///

1          *i.  Genuine Dispute Doctrine*

2          *a.  Applicable Law*

3          "Under California law, 'insurance bad faith' refers to a breach of the implied covenant of

4   good faith and fair dealing as that covenant applies to insurance policies." *Gentry v. State Farm*

5   *Mut. Auto. Ins. Co.*, 726 F. Supp. 2d 1160, 1166 (E.D. Cal. 2010).  "The implied promise requires

6   each contracting party to refrain from doing anything to injure the right of the other to receive the

7   agreement's benefits." *Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 720 (2007) (citation

8   omitted).  "To fulfill its implied obligation, an insurer must give at least as much consideration to

9   the interests of the insured as it gives to its own interests." *Id.*

10         To succeed on a bad faith claim, the insured must show: (1) benefits due under the policy

11  were withheld; and (2) the reason for withholding benefits was unreasonable.  *Id.* at 720–21.

12  "[W]hen benefits are due to an insured, delayed payment based on inadequate or tardy

13  investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately

14  payable, and numerous other tactics may breach the implied covenant because they frustrate the

15  insured's right to receive the benefits of the contract in prompt compensation for losses." *Waller*

16  *v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 36 (1995) (internal quotation marks omitted).

17         Generally, an insurer who denies or delays payment of policy benefits where there is a

18  genuine dispute as to the existence or amount of coverage will not be liable for bad faith.  *Wilson*,

19  42 Cal. 4th at 723.  However, "[t]he genuine dispute rule 'does not relieve an insurer from its

20  obligation to thoroughly and fairly investigate, process and evaluate the insured's claim," and "[a]

21  *genuine* dispute exists only where the insurer's position is maintained in good faith and on

22  reasonable grounds." *Id.* (emphasis in original).  Questions of whether an investigation was

23  reasonable and whether a genuine dispute existed are ordinarily questions for the trier of fact.

24  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1010 (9th Cir. 2004).

25         *b.  Analysis*

26         Defendant argues Plaintiffs' insurance bad faith claim fails as a matter of law because

27  there was a genuine dispute concerning the value of Plaintiffs' claim and there is no evidence of

28  unreasonable delay.  (ECF No. 19 at 18–24.)  More specifically, Defendant argues it reasonably

1  relied on two medical experts in denying Plaintiff's demand for the full UIM limit and it paid the

2  full amount immediately after the arbitration.  (*Id.*)  In opposition, Plaintiff argues Defendant did

3  not rely on any expert in denying UIM benefits during Simmons's life and there are triable issues

4  as to whether Defendant's reliance on Dr. Gershwin's report to dispute liability after Simmons's

5  death was genuine.  (ECF No. 25 at 17.)  Plaintiffs further argue there are triable issues as to

6  whether Defendant unreasonably delayed investigating Simmons's claim.  (*Id.* at 22.)

7        The California Supreme Court's decision in *Wilson* is directly on point.  In *Wilson*, an

8  intoxicated driver collided with the plaintiff's vehicle.  42 Cal. 4th at 717.  The plaintiff saw

9  doctors for her continued pain after the accident.  *Id.*  After reviewing x-rays and examining the

10  plaintiff, one doctor concluded the plaintiff "probably ha[d] degenerative disk changes as a

11  result" of neck injuries from the accident.  *Id.* at 717–18.

12        After reaching a settlement with the at-fault driver for his liability coverage, the plaintiff

13  sent a demand letter and documentation (including the medical report from her doctor) to her

14  insurance company.  *Id.* at 718.  The plaintiff sought the remainder of her UIM policy limits

15  based on her assertion that general damages resulting from such an injury at her young age would

16  exceed the $100,000 UIM policy limits.  *Id.*  Approximately one month later, a claims examiner

17  rejected the plaintiff's demand without speaking to any medical practitioner.  *Id.*

18        Shortly after the rejection, the plaintiff sought arbitration of her claim.  *Id.* at 719.  While

19  deposing the plaintiff in preparation for arbitration, the insurance company learned plaintiff's

20  doctor recommended surgery to treat her ongoing neck pain.  *Id.*  The insurance company then

21  retained an independent physician to examine the plaintiff and review her medical records.  *Id.*  In

22  June 2003 — nearly two years after rejecting the plaintiff's initial demand — the insurance

23  company paid the full remaining policy limits because the independent physician agreed the

24  plaintiff's neck injuries were caused from the accident and would require surgery.  *Id.*

25        The plaintiff brought a bad faith claim against her insurance company for the delay in

26  paying the benefits.  *Id.* at 720.  The trial court granted summary judgment in favor of the

27  insurance company.  *Id.*  The appellate court reversed.  *Id.*  On review, the California Supreme

28  Court affirmed the appellate court's decision, finding summary judgment was improper because

1    there were triable issues as to whether the decision to deny the plaintiff's claim was made

2    unreasonably and in bad faith.  *Id.* at 721–22.  The court emphasized the insurance company

3    could not, "consistent with the implied covenant of good faith and fair dealing, ignore [plaintiff's

4    doctor's] conclusions without any attempt at adequate investigation, and reach contrary

5    conclusions lacking any discernable medical foundation."  *Id.* at 722.  For the same reasons, the

6    court also found the genuine dispute doctrine did not apply.  *Id.* at 724.

7        Like in *Wilson*, there are triable issues as to whether it was reasonable for Defendant to

8    reject Simmons's initial demand.  Simmons's initial demand letter attached various medical

9    reports, including a January 2019 report from Simmons's pulmonologist, Dr. Lupercio.  In the

10   report, Dr. Lupercio opined that Simmons had various lung issues, such as reduced lung capacity

11   and a paralyzed hemidiaphragm of the left side of her chest that were "most likely related to the

12   accident."  (ECF No. 32-1 at 18.)  Defendant's claim notes acknowledge it received this

13   information.  (*Id.* at 19.)  Despite Dr. Lupercio's report, Defendant rejected Simmons's demand

14   without a consulting a medical practitioner.  (*Id.* at 20, 22.)  Defendant vaguely contends the

15   medical records submitted by Simmons suggested that her "left lung injury had resolved

16   following her discharge from the hospital."  (ECF No. 19 at 20.)  It is unclear how the claims

17   examiner reached that conclusion or whether she was qualified to do so.  Further, there is no

18   evidence the claims examiner had any reason to ignore or disbelieve Dr. Lupercio's report from

19   January 2019, which clearly opined that Simmons still suffered from lung issues related to the

20   accident at that time.

21       In addition, as in *Wilson*, there are triable issues as to whether Defendant's delay in

22   retaining a physician to conduct an independent medical examination was reasonable.  Simmons

23   initial demand was sent on September 9, 2019.  (ECF No. 31-2 at 17.)  Defendant rejected

24   Simmons's demand on October 1, 2019.  (*Id.* at 20.)  Defendant did not retain Dr. Gershwin until

25   almost eight months later, on May 20, 2020.  (*Id.* at 27.)  Defendant argues it retained Dr.

26   Gershwin because of Simmons's "unanticipated deposition testimony" in April 2020 that she was

27   still experiencing shortness of breath.  (ECF No. 19 at 20.)  However, similar information about

28   Simmons's shortness of breath after the accident appeared in Dr. Lupercio's reports and

1    Simmons's initial demand letter.  As such, a reasonable juror could find that it was unreasonable

2    for Defendant not to investigate Simmons's physical condition sooner.[7]

3         Moreover, not only was there significant delay between the initial demand and retaining

4    Dr. Gershwin, but there was also an even larger delay in obtaining Dr. Gershwin's report.

5    Despite being retained in May 2020, Dr. Gershwin did not issue a report until eleven months

6    later, on April 17, 2021.  (ECF No. 31-2 at 8.)  Defendant offers no explanation for the delay.

7         The thrust of Defendant's argument is that Dr. Gershwin's report created a genuine

8    dispute as to the value of Plaintiffs' claim, and Defendant was not required to pay the remaining

9    benefits until that dispute was resolved in arbitration.  In other words, Defendant only addresses

10   the reasonableness of its conduct after obtaining Dr. Gershwin's report.  Defendant does not

11   address the reasonableness of its conduct during the 20-month period between the initial demand

12   on September 9, 2019, and Dr. Gershwin's report on April 17, 2021.  For the reasons already

13   discussed, a reasonable jury could find there was no genuine dispute prior to Dr. Gershwin's

14   report and Defendant's delay up to that point was unreasonable.  *See Gentry*, 726 F. Supp. 2d at

15   1167–69 (finding triable issues as to whether defendant unreasonably delayed obtaining

16   plaintiff's medical records after plaintiff made two policy limit demands for medical costs that

17   exceeded $27,000).

18        There are also triable issues as to whether Defendant reasonably relied on its expert

19   reports once it finally obtained them.  For example, Plaintiff cites evidence that the claim

20   examiner questioned whether Dr. Gershwin, who is a rheumatologist and immunologist, would be

21   the best physician or if Defendant should retain a pulmonologist.  (ECF No. 31-2 at 29.)  There

22   are also triable issues as to whether Dr. Gershwin's conclusions were sound, such as his statement

23   that Simmons may have died because of a dental procedure that never took place.  (*Id.* at 37.)

24   Further, Defendant repeatedly argues its experts opined Simmons had fully recovered from the

25   accident "three to four" months after the accident.  (ECF No. 19 at 9, 13, 20.)  However, neither

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [7]      To the extent Defendant argues Simmons somehow contributed to that delay, the Court
28   finds there are triable issues as to Simmons's conduct as well as Defendant's conduct in obtaining
     additional medical records.  (ECF No. 31-2 at 17, 24.)

1   Dr. Gershwin nor Dr. Dublin made such a finding, nor did the doctors address Dr. Lupercio's

2   reports indicating that Simmons still suffered from lung issues months after the accident. While

3   reliance on an independent medical expert may support application of the genuine dispute

4   doctrine, a reasonable jury could find the foregoing evidence provides at the very least a

5   reasonable inference that Defendant acted in bad faith in relying on their experts to further delay

6   paying the policy limits. *See Wilson*, 42 Cal. 4th at 723 ("An insurer's good or bad faith must be

7   evaluated in light of the totality of the circumstances surrounding its actions.").

8          In sum, the Court concludes there are triable issues as to whether Defendant acted

9   unreasonably and whether a genuine dispute existed. The Court thus DENIES Defendant's

10  motion for summary judgment based on the genuine dispute doctrine.

11                             *ii.   Standing*

12         Defendant next argues Plaintiffs Arthur Rotter, Gene Rotter, and Danielle Rotter were not

13  parties to the insurance contract.[8]  (ECF No. 19 at 24.)  In opposition, Plaintiffs argue Arthur

14  Rotter, Gene Rotter, and Danielle Rotter were Simmons's heirs and became insureds qualified to

15  pursue a claim for wrongful death benefits under the policy after Simmons's death.  (ECF No. 25

16  at 22–23.)  To support their contention, Plaintiffs cite California Insurance Code § 11580.2,

17  which defines an insured to include "heirs" and recognizes their right to pursue underinsured

18  motorist benefits for wrongful death.  (*Id.*)  Defendant does not respond to Plaintiffs' argument in

19  its reply.  Based on the extremely limited briefing on this issue, the Court cannot say as a matter

20  of law that Arthur Rotter, Gene Rotter, and Danielle Rotter lack standing to bring their claims.

21         Accordingly, the Court DENIES Defendant's motion for summary judgment on as to

22  standing.

23                 B.      Breach of Contract Claim

24         Defendant argues Plaintiffs' breach of contract claim fails because is undisputed that it

25  paid the full $150,000 in UIM policy limits after arbitration.  (ECF No. 19 at 17.)  In opposition,

26

27  ---

    [8]      Defendant also argues Zhana McCullough lacks standing for the same reasons.  However,
28  Zhana McCullough previously dismissed her claims against Defendant and is no longer a party to
    this action.  (ECF No. 14.)

                                        12

1    Plaintiffs argue there are triable issues of material fact as to whether they are entitled to recover

2    damages related to Defendant's delay.  (ECF No. 25 at 14.)

3          Under California law, a claim for breach of contract includes four elements: that a contract

4    exists between the parties; that the plaintiff performed his contractual duties or was excused from

5    nonperformance; that the defendant breached those contractual duties; and that plaintiff's

6    damages were a result of the breach.  *Reichert v. Gen. Ins. Co.*, 68 Cal. 2d 822, 830 (1968).

7          Neither party cites — nor can the Court locate — any binding authority on the issue of

8    whether the mere fact that Defendant eventually paid in full precludes Plaintiffs' breach of

9    contract claim.  Based on the Court's research, district courts appear to be a split on the issue.

10   *Compare Gentry*, 726 F. Supp. 2d at 1170–71 (denying a motion for summary judgment on a

11   breach of contract claim where there were triable issues as to whether the defendant insurance

12   company unreasonably delayed paying the plaintiff's full benefits), *and Becerra v. Allstate*

13   *Northbrook Indem. Co.*, No. 22-CV-00202-BAS-MSB, 2022 WL 2392456, at *4 (S.D. Cal. July

14   1, 2022) (collecting cases and stating "it simply is not the case that a plaintiff who has been paid

15   all that is owed to her under an agreement is precluded as a matter of law from pursuing a breach

16   of contract claim on the theory of unreasonable delay"), *with Harner v. USAA Gen. Indem. Co.*,

17   497 F. Supp. 3d 901, 913 (S.D. Cal. 2020) (granting summary judgment on a breach of contract

18   claim, even though there were triable issues on the insurance bad faith claim, because the

19   defendant insurance company ultimately paid in full), *and Ives v. Allstate Ins. Co.*, 520 F. Supp.

20   3d 1248, 1255 (C.D. Cal. 2021) (granting summary judgment on a breach of contract claim

21   because the defendant insurance company paid all benefits due).

22         Based on the foregoing split amongst the district courts and absent fuller briefing on the

23   issue by the parties, the Court cannot say Plaintiffs' breach of contract claim fails as a matter of

24   law.  Although neither party discussed *Gentry*, the Court finds that case to be persuasive.  As the

25   *Gentry* court noted, some California state courts have found that "unreasonable delay in paying

26   policy benefits due is an actionable withholding of benefits which may constitute a breach of

27   contract as well as bad faith giving rise to damages in tort."  726 F. Supp 2d at 1170–71

28   (collecting cases).  The *Gentry* court also noted "the state legislature has codified the requirement

13

1   that contracts must be performed at the time specified or within a 'reasonable time.'" *Id.* at 1171

2   (citing Cal. Civ. Code § 1657).  For the reasons already discussed in the context of the insurance

3   bad faith claim, there are triable issues as to whether Defendant performed its contract within a

4   "reasonable time."  Absent sufficient argument to the contrary, the Court finds those triable issues

5   could support a breach of contract claim.

6         Therefore, the Court DENIES Defendant's motion for summary judgment as to Plaintiffs'

7   breach of contract claim.

8                     C.     Elder Abuse

9         Defendant argues Plaintiffs' elder abuse claim fails because Plaintiffs cannot establish

10   Defendant engaged in bad faith or breached the contract.  (ECF No. 19 at 25.)  In other words,

11   Defendant's argument as to the elder abuse claim is derivative of its arguments as to Plaintiffs'

12   other claims.  Because the Court finds Defendant is not entitled to summary judgment on

13   Plaintiffs' insurance bad faith and breach of contract claims, the Court DENIES Defendant's

14   motion for summary judgment on the elder abuse claim.

15                     D.     Punitive Damages

16         Defendant argues Plaintiffs cannot establish by clear and convincing evidence that

17   Defendant engaged in malice, oppression, or fraud by failing to pay policy benefits.  (ECF No. 19

18   at 27.)  In opposition, Plaintiffs argue the evidence demonstrates Defendant acted with conscious

19   disregard of Plaintiffs' rights.  (ECF No. 25 at 26.)

20         The standard for punitive damages is statutory.  The California Civil Code provides that

21   Plaintiffs must prove "by clear and convincing evidence that the defendant has been guilty of

22   oppression, fraud, or malice."  Cal. Civ. Code § 3294.  The statute defines "oppression" as

23   "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of

24   that person's rights."  *Id.* § 3294(c)(2).

25         For the same reasons already discussed at length, the Court finds there are triable issues as

26   to whether there was a genuine dispute and whether Defendant unreasonably delayed paying

27   Simmons's benefits in conscious disregard of Plaintiffs' rights.  *See Gentry*, 726 F. Supp. 2d at

28   1172 ("[T]he court cannot say that a reasonable jury could not find there was a conscious

1  disregard of plaintiff's right to have his UIM claim resolved in a timely manner.").

2        Accordingly, the Court DENIES Defendant's motion for summary judgment as to

3  punitive damages.

4  **IV.    CONCLUSION**

5        For the foregoing reasons, the Court DENIES Defendant's Motion for Summary

6  Judgment.  (ECF No. 19.)  The parties are ORDERED to file a Joint Status Report within thirty

7  (30) days of the electronic filing date of this Order indicating their readiness to proceed to trial

8  and proposing trial dates.

9        IT IS SO ORDERED.

10  DATE:  August 11, 2023

11

12

13  _____

14  Troy L. Nunley
    United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28